DECISION
This case is before the Court on Claimants' appeal from the decision of the Special Master holding that the claimed funds are not entitled to priority payment as a deposit with Heritage Loan and Investment Company ("Heritage"). The Claimants appeal pursuant to Administrative Order No. 94-12, which requires that this Court provide a de novo review of the claim here at issue. The Receiver opposes the appeal.
I
The events leading up to this case have a long and complex history. Summarized briefly, the facts are as follows:
Following the failure of a number of RISDIC-insured financial institutions in the State of Rhode Island, the Governor ordered the closing of these institutions, not including Heritage Loan and Investment Company (Heritage), on January 1, 1991. The Heritage Receivership had commenced on November 18, 1990, although it did not actually close until January 25, 1991. Heritage was not subject to the original Depositor's Economic Protection Corporation (DEPCO) statute, G.L. 1956 (1991Reenactment) § 42-116-1 et al., which passed in 1991, but the General Assembly amended the statute in 1992 to subject Heritage to the benefits of the DEPCO statute and to allow valid depositors to be paid in the same manner as the depositors of other formerly RISDIC-insured institutions.
On May 29, 1992, the Heritage Receiver filed an Application for Authority to Enter into Asset Purchase Agreement, the DEPCO/Receiver Agreement. On June 22, 1992, Mr. Justice Krause entered a Final Order and Judgment approving the transfer of Heritage assets to DEPCO. Under this agreement, DEPCO assumed certain deposit liabilities of Heritage as of the Receivership date, November 18, 1990. DEPCO began to pay Heritage depositors money due them, although funds were withheld in the case of certain unusual accounts pending further investigation or hearings. As a result of an Order entered on February 12, 1992 by Mr. Justice Krause, Special Master William J. McAtee was appointed as Master in the Receivership for the purpose of hearing and determining the claims filed with the Receiver.
Phyllis Gillette and Mario Papitto ("Claimants") received the entire amounts of four interest-bearing accounts, but the Receiver did not pay out some other claimed funds, which consisted of $150,000 in two non-interest bearing "off-line" accounts and $47,400 in "safekeeping" funds. On July 25, 1994, Master McAtee issued a decision denying Claimants access to their claimed funds as deposits at Heritage. Noting that these claims differed from other claims filed in that no documentary evidence supported the existence of the two non-interest bearing accounts, the Master held that the quality of evidence was insufficient to demonstrate the existence or amount of the two accounts. He stated that Heritage did not maintain these accounts in the usual course of business, but rather the Claimants kept their money there in order to keep it secret. The Master concluded that all claimed funds were more in the nature of a bailment than a deposit and, as such, they were not entitled to priority as a deposit with Heritage.
II
Claimants base their claims to the monies in the two non-interest bearing accounts and the safekeeping funds primarily on their own testimony and that of several former employees of Heritage, including George Marzilli, Sheila Andreozzi, and Joseph Mollicone, Jr. The only documentary evidence presented consisted of three receipts, totalling $47,400, for cash presented to Heritage for safekeeping in its vault. As stated above, Gillette maintained four additional accounts, apparently on-line accounts, which the Receiver has already paid out to her.
Mollicone, Marzilli, and Andreozzi all testified that Heritage commonly held passbooks for customers, as Claimants testified it did for them. Marzilli testified that Gillette had two non-interest bearing accounts and that the bank held all of her four or five passbooks for her. He also testified that the bank required use of deposit and withdrawal slips for activity on such accounts. Mollicone stated that he had a long-standing relationship with Gillette. He testified that he had an understanding with Gillette that he would keep her money for her so that there would be no record of the funds and that he would keep cash deposited for safekeeping in "his" section of the bank's safe.[1]
Testifying on their own behalf, Gillette and Papitto both outlined their memories of making deposits and/or withdrawals. Heritage employees, they stated, would bring out the batch of six passbooks when they came in, giving them the opportunity to review how much money was deposited in the two accounts in question. Heritage did not require deposit or withdrawal slips, they said. The testimony of both Claimants was consistent in claiming a final deposit amount, at the time of the closing of Heritage, of $105,000 in one account and $45,000 in the other. Gillette additionally stated her intention to put the total amount given to Mollicone as safekeeping money into a deposit account, but acknowledged that she had not gotten around to doing so. After the closure of Heritage, no passbooks were discovered.
Claimants argue that credible and essentially uncontradicted testimony satisfies their burden of proof in establishing the existence and amount of their off-line accounts. They maintain that the Master's decision penalizes them for Heritage's loss or destruction of the passbooks. Claimants urge the Court to apply the doctrine of estoppel; that is, because the bank provided these services — safekeeping cash and holding passbooks on non-interest bearing deposits — to its customers, it cannot now refuse to pay back the funds by claiming that the funds received were not deposits.
The Receiver counters that inadequate documentary evidence makes it impossible to determine the existence or balance of the claimed accounts. He argues that, without a passbook or other substantial evidence, Claimants have not carried their prima facie burden of proof to establish the existence of the accounts.O'Neil v. New England Trust Co., 28 R.I. 311, 57 A. 63 (1907). He points to the definition of "deposit" as given in12 U.S.C. § 1813(1) and elucidated in FDIC v. Philadelphia Gear Corp.,476 U.S. 426, 106 S.Ct. 1931, 90 L.Ed.2d 428 (1986), under which a claimant must show that: (1) there is an unpaid balance; (2) of hard earnings; (3) received or held by the bank: (4) in the usual course of business; (5) for which the bank has given or is obligated to give credit. The Receiver contends that the claimed accounts fell in the category of a bailment, kept for them at Heritage through a private arrangement, primarily with Mollicone. He notes that Gillette admitted that the cash left for safekeeping did not constitute a deposit. The claimed funds, then, were not kept by Heritage in the usual course even of its unique business practices and, hence, do not qualify as a deposit, he concludes.
III
The Court holds that the Special Master correctly determined that the claimed funds did not qualify as deposits entitled to priority as deposits with Heritage.
The claimed funds fail to meet the ordinary definition of a deposit as laid out in 12 U.S.C. § 1813(1) and FDIC v.Philadelphia Gear Corp. Specifically, Claimants did not successfully show that (1) there is an unpaid balance or (2) that the money was held in the usual course of business. Claimants bear the burden to prove that they are entitled to the funds as priority deposits with Heritage. See O'Neil v. New England TrustCo. The evidence is insufficient to carry this burden.
The Master notes and the Court agrees that this claim differs from other similar claims against Heritage, including the Claimof Antonio Caliri, supra, in that here no passbooks or any other documentary evidence supports the existence of the two non-interest bearing accounts. This raises an additional question as to why the Claimants should succeed in this unique position and forces the Court to rely primarily on the testimony of the Claimants themselves. Claimants and bank employees have offered essentially uncontroverted testimony as to the existence of the accounts; claimants' testimony concerning the amount of the accounts is uncontradicted. A court ordinarily should give such testimony great weight, but there are certain well-defined exceptions and qualifications. As spelled out in Laganiere v.Bonte Spinning Co."
 ". . . positive uncontroverted testimony may be rejected if it contains inherent improbabilities or contradictions, which alone, or in connection with other circumstances tend to contradict it. . . . Such testimony may also be disregarded if it lacks credence or is unworthy of belief . . . especially if the testimony is that of a party to the litigation or an interested witness." 236 A.2d 256, 258 (R.I. 1967).
Given the complicated relationship of Heritage and its employees to its clients, including the Claimants, it would be irresponsible for this Court to accept at face value the testimony of Claimants as to the existence and amount of these two accounts. The Court respectfully defers to the experience of the Master in his determination of the unusual nature of these claims, even in relation to other claims against Heritage. Indeed, if Claimants held funds in these accounts, they may have transferred part or all of the money prior to the closing. Bank employees were unable to corroborate Claimants' testimony as to the amount in the accounts at the time of closing. Even if this Court were to accept the existence of the accounts, there is no reliable way to determine the amount on deposit at the time of Heritage's closing.
Claimants also fail to establish that Heritage held the funds in question even in the usual course of its otherwise unique business. Claimant Gillette established the accounts with the explicit understanding by Mollicone and herself that they differed from other "off-line" accounts in that no records whatever were kept, in order to preserve their secrecy. Gillette opened and maintained the accounts through a personal arrangement with Mollicone, and perhaps tangentially with other Heritage employees. It is even more apparent that the cash left with Heritage for safekeeping fell completely outside of normal deposit business operations. Gillette admitted that she intended to put this money into a deposit account but had neglected to do so up to the time of the bank's closing. At the time of closing, then, Heritage held this money only due to a personal arrangement between Gillette and Mollicone. The two accounts and the safekeeping cash, then, fit more into the category of a bailment than a deposit.
Under the doctrine of D'Oench, Duhme Co. v. Federal DepositIns. Corp., 315 U.S. 830, 62 S.Ct. 910, 86 L.Ed. 956 (1942), reflected in G.L. 1956 (1991 Reenactment) § 19-15-12, a receiver is immune from assertion of claims not evidenced by a formal writing on record with the insolvent bank. A receiver takes on the assets and liabilities of a bank free of any secret arrangements or deals allegedly made with employees of the bank to which the receiver has no access. Claimants here would have the Court expand the scope of the Receiver's obligations, beyond what this statute allows, to hold the Receiver accountable for any undocumented side deals made by Heritage. State law and the public policy underlying the D'Oench-Duhme doctrine protects the receiver and any liquidator from claims based on totally secret arrangements like the claims in question, which are not available to the liquidator as evidence of the liabilities which it is charged with insuring, nor recorded in any writing of the bank.
IV
The Claimants' appeal of the Special Master's decision holding that the claimed funds are not entitled to priority payment as a deposit with Heritage is denied. The Receiver will present an appropriate judgment for entry on notice to the parties.
[1] This Court has already found that any testimony from Joseph Mollicone, Jr., on any material issue is unworthy of any credibility. Paradis v. Heritage Loan and Investment Company:Claim of Antonio Caliri, C.A. No. PM-90-7592, Rescript, March 15, 1995; appeal pending, In re: Claim of Antonio Caliri, No. 95-207-A, argued January 23, 1996.